IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROSS GLENN MOORMAN, JR.,

         Plaintiff,

      v.

UNUMPROVIDENT CORPORATION,
UNUM LIFE INSURANCE COMPANY
OF AMERICA, and UNUM
CORPORATION,

         Defendants.

CIVIL ACTION FILE

NO. 1:04-CV-2075-BBM

## **O R D E R**

This action alleging wrongful denial of disability insurance benefits is before the court on Plaintiff's Motion for Leave to Depose Defendant UnumProvident Corporation and/or Defendant Unum Life Insurance Company of America and for Additional Time to Submit Summary Judgment Materials [Doc. No. 37]; Defendants UnumProvident Corporation and Unum Corporation's Motion to Dismiss Plaintiff's Complaint or Alternatively for a More Definite Statement [Doc. No. 3]; and Defendant Unum Life Insurance Company's Motion to Dismiss [Doc. No. 26].

## I.   **Factual Background**

Plaintiff Ross Glenn Moorman ("Moorman"), formerly employed by Southeastern Steam, Inc. ("Southeastern Steam"), was covered under the Group

Disability Insurance Plan ("Plan").  The Plan was insured by Defendants Unum Life Insurance Company of America ("Unum Life") and UnumProvident Corporation ("UnumProvident").[1]  In February 1999, Moorman was diagnosed with rectal cancer. After he initially qualified as disabled under the Plan, it was determined that he no longer satisfied the definition of disability.  Moorman appealed the denial of disability benefits under the Plan but was unsuccessful.  On July 16, 2004, Moorman filed the Complaint giving rise to this action, in which he alleges wrongful denial of disability benefits and raises various state and federal law claims.[2]

The manner by which this case will proceed will be greatly affected by the resolution of the question of whether the Plan is governed by the Employee Retirement Income Security Act ("ERISA").  See 29 U.S.C. §§ 1001 et seq.[3]  The court will now present facts relevant to the issue of ERISA governance.

By letter dated October 17, 1996, Brian James Glenn ("Glenn"), an agent for Unum Life, contacted Anne Rivers Carter ("Carter"), the office manager of

---

[1]Although pleadings have been filed in the name of Unum Corporation ("Unum"), Defendants have informed the court that Unum is a non-entity.  Therefore, when the court refers to the Defendants in the case, it is referring to UnumProvident and Unum Life.

[2]The court has provided only a brief recitation of the facts related to the denial of benefits to Moorman because the wrongful denial of benefits allegation is not the subject of this Order.

[3]If the court determines that the Plan is governed by ERISA, at least some of Moorman's other claims will be preempted.  See 29 U.S.C. § 1144(a).

Southeastern Steam, to request the opportunity to present the Plan to Southeastern Steam employees, hoping to solicit enrollment of the employees. Prior to receiving the letter, no one at Southeastern Steam had contacted Glenn to request that he provide disability insurance coverage to its employees. Several months later, on April 24, 1997, Glenn met with company employees individually to discuss coverage under the Plan.[4] No representative from Southeastern Steam was present during these meetings. The decision as to whether to sign up for disability insurance was left to the individual employee. Those who wished to enroll completed Disability Program Enrollment Forms, which Glenn drafted and provided. The forms stated, "S.E.S. Industries[5] is offering a comprehensive Disability program to protect you and your family in the event a non-occupational accident or sickness causes you to miss work." Carter never read this statement and believed Unum Life, rather than Southeastern Steam, was providing the Plan. At the meetings, Glenn also discussed the benefits and premium amounts with each employee.

---

[4]Southeastern Steam did not publicize that Glenn was coming to discuss disability insurance with employees. Carter testified that publicity was conducted by "word of mouth, like, hey, there's a guy coming, if you want disability insurance, you can meet with him, you know, he'll explain it to you."

[5]S.E.S. Industries, Inc. stands for Southeastern Steam.

Under the heading "Benefits," Southeastern Steam's employee handbook states: "The company makes available to employees access to benefits designed to meet the needs of employees and to provide protection from financial hardship.  These benefits will be reviewed periodically to assure that they keep pace with area practice and employee needs." In the same section, under the subheading "Disability Insurance," the handbook states, "Disability insurance is available to all full-time employees.  The premium for this coverage is the sole responsibility of the employee."[6]  Southeastern Steam determined that full-time employees who had been working for at least ninety days were eligible to participate in the Plan.  Enrolled employees were required to pay their entire premium amounts on a post-tax basis.  Carter collected these premiums from employees by way of payroll deductions and remitted them to Unum Life.  Additionally, when an employee made a claim under the Plan, Carter completed and submitted the employer verification form to Unum Life.[7]

The participating employees were not provided copies of the Plan or any other written documents at the time of their enrollment.  The Plan documents were later mailed to Carter, who filed them in a closet at Southeastern Steam.  The Plan

---

[6]Carter testified that this provision in the employee handbook refers to the disability insurance under the Plan.

[7]Carter testified that she had two or three blank claim forms that Glenn had given her.

Certificate provides:  "This policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments."  The Summary Plan Description designates Southeastern Steam as the Plan administrator and as the agent for service of legal process on the Plan.  Moorman asserts that Southeastern Steam never intended for the plan to be governed by ERISA and that any designations implicating ERISA were fraudulently inserted by Defendants.        As of November 1, 2004, Unum Life terminated the Plan because Southeastern Steam had fewer participating employees than required.  Employees of the company who presently have disability insurance have policies from AFLAC, a separate insurance company.

II.    **Procedural Background**

On August 9, 2004, Defendants UnumProvident and Unum filed a Motion to Dismiss, designated alternatively as a Motion for More Definite Statement, but which the court will refer to as a Motion to Dismiss.  In its October 22, 2004 Order, the court converted the motion into a motion for summary judgment as to the limited issue of whether the Plan is governed by ERISA.  In its Order, the court provided the parties twenty days to submit evidence relevant to ERISA governance of the Plan.  The period was to end on November 12, 2004.

On October 28, 2004, Defendant Unum Life filed a Motion to Dismiss.  Because the document mirrored the Motion to Dismiss filed previously by UnumProvident and Unum, the court has chosen to treat it the same, converting it into a motion for summary judgment on the limited issue of ERISA governance, as stated in the court's Order dated December 29, 2004.

On November 5, 2004, Defendants moved to depose a representative of Southeastern Steam.  The court granted Defendants' motion and extended the deadline for submitting additional evidence relevant to ERISA governance until January 28, 2005.  Both parties have presented evidence they perceive to be relevant to the court's evaluation of ERISA governance.  Plaintiff has also moved for leave to depose representatives of the Defendants, as well as for an extension of time to present additional evidence related to the issue of ERISA governance.  The court now addresses the various motions before it.

**III.**   **Moorman's Motion for Leave to Depose and Extension of Time**

Moorman has filed a Motion for Leave to Depose Defendant UnumProvident Corporation and/or Defendant Unum Life Insurance Company of America and for Additional Time to Submit Summary Judgment Materials.  Based on the court's review of Moorman's motion, it appears to the court that Moorman desires to depose representatives of the Defendants on the matter of contribution as it relates to the

applicability of the safe harbor exception to ERISA, discussed below.  The Defendants

have abandoned their argument that Southeastern Steam contributed to the Plan, and

the court denies Moorman's motion for additional discovery on that issue for the

reason that the issue is no longer in the case.   However, in the interest of

thoroughness, the court will discuss its additional reasons for denying Moorman

further discovery on the issue of contribution.

As an initial matter, in its Order dated October 22, 2004, the court did not

expressly prohibit any party from gathering and presenting evidence relevant to

ERISA governance.  To the contrary, the court specifically requested that the parties

present material evidence related to the maintenance and administration of the Plan.

The fact that Plaintiff did not attempt to seek out additional relevant evidence during

the twenty-day period provided by the court does not now require the court to grant

Plaintiff's request to delay this proceeding further for the purpose of doing discovery

he could have done earlier.[8]

To the extent Moorman did make the request during the twenty-day period, the

court notes that "[a]n application to the court for an order shall be by motion."  Fed.

R. Civ. P. 7(b)(1).  In this case, Moorman argued for additional discovery not in the

_____

[8]Moorman asserts he previously made the same request in his response brief to
Defendants' Motion to Depose Southeastern Steam.

context of a motion but within his response brief.  Not until January 28, 2005, more than two months after the court's initial submission deadline, did Moorman make a formal motion to the court.  The court advised the parties of its intention to determine the issue of ERISA governance sooner rather than later so that the larger disputes in the case may be resolved.  The court will therefore deny Moorman's motion because, among other reasons, it ignores the importance of litigating efficiently.  In addition to the court's procedural concerns, the court would not be aided by further discovery on this narrow issue.

In converting the motions to dismiss to a motion for summary judgment, the court was attempting to resolve the important preliminary issue of whether the Plan is governed by ERISA.  The court's inquiry is narrower than Defendants appear to believe.  In determining ERISA governance, the court "focuses on 'the employer . . . and [its] involvement with the administration of the plan,' . . . not the conduct of any other ERISA entity."  <u>Anderson v. Unum Provident Corp.</u>, 369 F.3d 1257, 1263 (11th Cir. 2004) (citations omitted).  Moorman seeks evidence from representatives of Defendants, none of which is the employer in this case.  Because such evidence would be outside the scope of information relevant to the court's analysis of ERISA governance, the court DENIES Plaintiff's motion for leave to depose and for extension of time.

**IV.**   <u>**Defendants' Converted Motion for Summary Judgment**</u>

      A.      Summary Judgment Legal Standard

      The court has converted Defendants' motions to dismiss into a motion for summary judgment on the narrow issue of ERISA governance of the Plan.  A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In making this assessment, the court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party."  <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1285 (11th Cir. 1997).

      Defendants argue that the Plan is governed by ERISA, <u>see</u> 29 U.S.C. §§ 1001 <u>et seq.</u>  If this argument is accepted by the court, Moorman's state law claims would be preempted in this action.  <u>See</u> 29 U.S.C. § 1144(a).  ERISA governs employee benefit plans[9] if they are established or maintained "by an employer engaged in commerce or in any industry or activity affecting commerce."  29 U.S.C. § 1003(a)(1).  An ERISA

---

      [9]The definition of "employee welfare benefit plan" includes a plan maintained for the purpose of providing disability benefits.  29 U.S.C. § 1002(1).

plan "is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982).  Moorman alleges that the Plan is not governed by ERISA because it was not established, maintained, or endorsed by Southeastern Steam. Defendants dispute Moorman's position, claiming that Southeastern Steam's actions brought the Plan under the governance of ERISA.

      B.     ERISA Governance Generally:  Establishment or Maintenance[10]

An employee welfare benefit plan governed by ERISA is any (1) plan, fund or program (2) established or maintained (3) by an employer (4) to provide beneficiaries (5) benefits through an insurance policy.  See id. at 1371.  In this case, the inquiry is whether the Plan was established or maintained by Southeastern Steam.

In conducting this inquiry, the court will examine the involvement of the employer in the administration of the Plan.   Anderson, 369 F.3d at 1263.  "[T]he 'established or maintained' requirement is designed to ensure that the plan is part of an employment relationship . . . . [The court] determine[s] whether the plan is part of

---

[10]Typically, courts have first considered whether a plan falls under the safe harbor exception and then have performed the more general evaluation of whether a plan was established or maintained.  See Anderson, 369 F.3d at 1263 n.2; see also Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1214 (11th Cir. 1999).  In this case, the court finds it clearer to present the more general analysis first.

an employment relationship by looking at the degree of participation by the employer in the establishment or maintenance of the plan.'" Id. (citation omitted).   Generally speaking,

> cases turn on the role of the employer in providing the benefit.  If the employer has a role in obtaining and providing the benefit, plan status will likely be found.  However, where the employer has no role and, for example, the insurance is purchased by the employee, even by way of payroll deductions, the program will not be established or maintained by the employer and will not be a plan. . . .  [A]n employer or employee organization can establish or maintain a plan rather easily.

Ronald J. Cooke, ERISA Practice & Procedure § 2.6 (2d ed. 2004).   "A plan is 'established' when there has been some degree of implementation by the employer going beyond a mere intent to confer a benefit."   Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1214 (11th Cir. 1999). "[N]o single act in itself necessarily constitutes the establishment of the plan, fund, or program."   Donovan, 688 F.2d at 1373.

In Donovan, the court described what may be relevant in determining whether an employer has established an ERISA plan:

> Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision has become reality-- e.g., financing or arranging to finance or fund the intended benefits, establishing a procedure for disbursing benefits, assuring employees that the plan or program exists--but it is the reality of a plan . . . and not the decision to extend certain benefits that is determinative.

<u>Id.</u>  The Eleventh Circuit has referred to a seven-factor test for evaluating whether a plan was established by an employer.  The factors are:

> (1) the employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of a fund to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure to correct known perceptions of a plan's existence; (6) the reasonable understanding of employees; and (7) the employer's intent.

<u>Butero</u>, 174 F.3d at 1215 (holding that the employer established the plan because the employer consulted an insurance agent, selected the terms of the policy, solicited enrollment from employees, collected money through payroll deductions, and remitted premiums to the insurance company).

Defendants contend that Southeastern Steam established an employee welfare benefit plan because (1) the Plan documents implicated ERISA, and (2) Southeastern Steam advertised the existence of the Plan to employees, (3) Southeastern Steam set eligibility requirements, (4) Southeastern Steam collected and remitted premiums, and (5) Southeastern Steam submitted claim forms.  The court will evaluate whether these facts are disputed and will then consider whether the undisputed facts, if any, support a finding that Southeastern Steam established or maintained an employee welfare benefit plan.

Language of the Plan Implicating ERISA[11]

Defendants assert that the language of the Certificate shows that Southeastern

Steam established an employee welfare benefit plan.  The Certificate's Summary Plan

Description lists the Plan's name as "Southeastern Steam, Inc." and designates

Southeastern Steam as the Plan Administrator and agent for service of legal process

on the Plan.  Moorman does not dispute that this language is contained in the Plan

documents.  Moorman asserts, however, that the designation of Southeastern Steam

as the Plan administrator and agent for service of process is immaterial because the

designations appear nowhere in the insurance policy itself, but instead appear in the

---

[11]Before considering the facts relevant to whether Southeastern Steam established
or maintained an employee welfare benefit plan, the court will address a broad assertion
made by Defendants.  Defendants believe the language of the Certificate shows
unequivocally that the Plan should be governed by ERISA.  As noted, the Certificate
provides:

> This policy is delivered in and is governed by the laws of the governing
> jurisdiction and to the extent applicable by the Employee Retirement Income
> Security Act of 1974 (ERISA) and any amendments.

However, reference to ERISA in plan documents is not necessarily dispositive.  See Dept.
of Labor Advisory Opinion 2000-05A (May 17, 2000) (determining that a plan exempt from
ERISA coverage as a church plan exception, see 29 U.S.C. § 1002(33), would not be
removed from the exception only because of language in the policy implicating ERISA).
Even if the inclusion of ERISA language in the Plan were dispositive, the court notes that
the language in the Plan does not expressly indicate that the Plan is governed by ERISA
but instead states that the Plan is governed by ERISA "to the extent applicable."  It is the
court's task to determine the question of ERISA's applicability to the Plan.

Summary Plan Description.  Moorman relies on the holding in <u>Shaw v. Connecticut</u>

<u>General Life Insurance Co.</u>, 353 F.3d 1276 (11th Cir. 2003), in which the court

determined that it would not defer to language in the Summary Plan Description

granting discretion to the administrator.  <u>Id.</u> at 1282-83.  Moorman characterizes the

<u>Shaw</u> holding as follows:   "the court concluded that terms, conditions and

descriptions appearing  only in the Summary Plan Description could not be relied

upon by the insurer where those terms, conditions and descriptions did not appear

in the policy itself."   The court finds <u>Shaw</u> inapposite.   In <u>Shaw</u>, the court was

considering whether the administrator had been granted discretion, not whether the

policy was governed by ERISA.  Moreover, the <u>Shaw</u> court determined that the policy

contained an explicit amendment procedure that had not been followed, as well as

an integration clause that provided the policy and the application constituted the

entire agreement between the parties.   <u>Id.</u> at 1283.   Moorman makes no similar

argument here, and, in this case, there is nothing in the policy itself that directly

contradicts anything in the Summary Plan Description.[12]

------

[12]Moorman argues, however, that the Summary Plan Description is ambiguous
because it also indicates that the Plan is subject to "Insurer Administration."  The court
construes the Plan to be referring to the fact that administrative activities under the Plan
were left to both Defendants and Southeastern Steam.  In any event, as noted, the Plan
language is not dispositive but is simply relevant.

Additionally, Moorman asserts that the language discussed above was fraudulently inserted by Defendants; thus, the Plan cannot be governed by ERISA. To support his position, Moorman contends that Southeastern Steam "never intended to establish or maintain, and never thought that it had established or maintained, an insurance plan governed by ERISA. Likewise, Plaintiff never agreed to be covered under an ERISA-governed policy, and this, to his knowledge, was never the case."[13] First, the court questions whether the assertion that the language inserted in the Plan was not in keeping with Southeastern Steam's intentions constitutes evidence of fraud.[14] Most importantly, an employer's subjective belief is irrelevant in determining

_____

[13]In Carter's Affidavit, she states, "The corporate officers, directors, and shareholders of Southeastern Steam at no time intended to establish or maintain, sponsor or endorse, and at no time considered themselves to have established or maintained, sponsored or endorsed, an employee welfare benefit plan."

[14]The court gathers that Southeastern Steam is arguing that because it did not intend for the Plan to fall under ERISA governance, any language to the contrary in the Plan was fraudulently inserted. Southeastern Steam's position is flawed. Whether or not a Plan falls under ERISA governance is dependent on the employer's actions and the employees' understanding. Simple insertion of conclusory language saying ERISA governs will not satisfy the court that ERISA governs.

The court has reviewed the documents submitted by Moorman that could possibly be construed as evidence of fraud. Certainly, Moorman makes broad allegations that Defendants fraudulently inserted ERISA language into the Plan documents, but Moorman provides no evidence supporting these allegations. The court acknowledges that Moorman attached to the Complaint an internal memorandum from Defendants, which discusses a policy "to get new and existing policies covered by ERISA." The document does not discuss fraudulently inserting language that would bring policies under ERISA coverage, however. To the contrary, the memorandum states that "we need to be diligent and thorough in determining whether a policy is covered." Furthermore, the memorandum states as an objective "to pay all valid claims and deny invalid claims."

whether an ERISA plan has been established.  "If the . . . [p]lan satisfies the statutory definition of an employee welfare benefit plan, then ERISA applies regardless of the intent of the plan administrators and fiduciaries."  <u>Anderson</u>, 369 F.3d at 1264.  The court finds that Moorman has not presented evidence that Defendants inserted the language fraudulently, and, moreover, that Southeastern Steam's subjective belief that it had not established an ERISA plan is not dispositive on the issue of whether the Plan is governed by ERISA.

In sum, the court finds that the language in the Plan implicating ERISA, though not dispositive, is relevant to the consideration of whether Southeastern Steam established an employee welfare benefit plan.

<u>Information Conveyed to Southeastern Steam Employees</u>

Defendants assert that Southeastern Steam conveyed to its employees that it was establishing an employee welfare benefit plan.  Specifically, the Certificate stated that "[a]ll employees in active employment" "working at least 35 hours per week"

_____

Moorman attaches a News Release from Georgia's Insurance Commissioner, who has fined UnumProvident Corp. for improper claims handling practices.  This evidence, if further developed and shown to be related to Moorman's case, could be relevant to the alleged wrongful denial of Moorman's claim.  However, the court does not find that the News Release creates an issue of fact as to whether Defendants fraudulently inserted ERISA language into the Plan in this case.  For purposes of the converted motion for summary judgment, Moorman must do more than make broad allegations unsupported by evidence.

were eligible under the Plan, and the Certificate also provides that "[t]he claim form is available from your Employer" and that "[y]ou and your Employer must fill out your own sections of the claim form."  The court finds that evidence in the Certificate notifies employees that there is a disability insurance plan for which they might be eligible and that Southeastern Steam plays some role in the claims process related to that policy.[15]

As further evidence of Southeastern Steam's establishment of the Plan, Defendants state that the group disability program was identified as an employee benefit in Southeastern Steam's employee handbook, which provides:

> The company makes available to employees access to benefits designed to meet the needs of employees and to provide protection from financial hardship.  These benefits will be reviewed periodically to assure that they keep pace with area practice and employee needs.
>
> . . .
>
> Disability insurance is available to all full-time employees.  The premium for this coverage is the sole responsibility of the employee.[16]

_____

[15]The court will discuss Southeastern Steam's actual involvement in the claims process below.  Here, the reference is made as it pertains to what was conveyed to employees in the Plan documents.

[16]This contradicts Carter's affidavit, taken previously, in which she averred that "Southeastern Steam did not include the Plan in any cafeteria plan, which Southeastern Steam did not have, or other employee benefit plan, and Southeastern Steam did not so advertise the Plan."  Carter also averred that "[n]owhere in Southeastern Steam's employee handbook or policies, or any other employment information, was there any indication that the company endorsed or sponsored the Plan, and no representative of the company ever

In her deposition, Carter confirmed that the reference in the employee handbook was to the disability insurance issued by Defendants, the Plan.  Moorman contends that Southeastern Steam "did not advertise the Plan as being its own," but the court finds that the language "the company makes available to employees access to benefits" is properly construed as evidence that Southeastern Steam has established the Plan.  Furthermore, the court finds the evidence from Southeastern Steam's employee handbook highly persuasive because Southeastern Stem representatives chose to include it in a handbook expressly intended for employees.  Accordingly, the court finds that Southeastern Steam conveyed information to employees of the establishment of an employee welfare benefit plan--in this case, the Plan.

<u>Southeastern Steam's Administrative Duties Associated with the Plan</u>

Defendants also assert that Southeastern Steam was involved in administrative duties, such as collecting and remitting premium payments, maintaining and submitting claim forms, and determining eligibility requirements, that go beyond basic ministerial tasks.

---

made any such representation to any employee." Although the court realizes it should not be engaged in credibility analysis, Carter herself acknowledged that she did not read her Affidavit closely before signing it.  Therefore, the court will not rely on the averments of Carter's Affidavit, particularly those contradicted by other evidence in the case.

Moorman acknowledges that Southeastern Steam withheld premiums from employees' paychecks and submitted a check from Southeastern Steam's account to Defendants in the appropriate amount of the total premiums.

Based on the record, it appears to the court that Carter maintained a small supply of claim forms provided by Defendants and Moorman acknowledges that Carter filled out the employer verification portion of those forms in accordance with directions from Defendants.

Moorman seemingly denies that Southeastern Steam set eligibility requirements, while at the same time admitting that Southeastern Steam set a waiting period. Additionally, Moorman asserted that eligibility for the Plan was not linked to employment, but the Plan documents and employee handbook show that only employees working full-time, or at least thirty-five hours a week, were eligible. Based on its review of the record, the court finds that Southeastern Steam set at least one term of eligibility; maintained and completed a portion of the claim forms; and collected and remitted premiums on behalf of employees.

In sum, the Plan named Southeastern Steam as the Plan administrator and legal agent, the Plan was listed as an employee benefit in Southeastern Steam's employee handbook, Southeastern Steam set at least one term of eligibility, Southeastern Steam maintained a supply of claim forms and completed the employer

verification portion of the forms, and Southeastern Steam made appropriate payroll deductions for employees' premiums and remitted the payments to Unum Life.  The court finds that this evidence clearly demonstrates that Southeastern Steam established an employee welfare benefit plan.  The court need not formally evaluate whether Southeastern Steam also maintained an employee welfare benefit plan because only establishment *or* maintenance is necessary.  In any event, the parties have made no distinction between evidence of establishment versus evidence of maintenance.  Having determined that Southeastern Steam established an employee welfare benefit plan, the court will next determine whether the safe harbor exception applies.

        2.        Safe Harbor Exception:  Endorsement

"To determine whether ERISA applies to a particular plan, courts . . . examin[e] whether the plan falls into the regulatory safe harbor, which excludes from ERISA's jurisdictional ambit certain group or group-type insurance programs offered by an insurer to employees or members of an employee organization."  Anderson, 369 F.3d at 1263 n.2.  Moorman claims the Plan falls under the "safe harbor" exemption from ERISA governance as set forth in the Department of Labor Regulations as found at 29 C.F.R. § 2510.3-1(j), which excepts from the definition of "employee welfare benefit plan" certain "group or group-type insurance program[s] offered by an insurer to

employees."  29 C.F.R. § 2510.3-1(j).  There are four elements necessary to satisfy the safe harbor exemption:  (1) no contributions are made by an employer or employee organization; (2) participation in the program is completely voluntary for employees; (3) the sole functions of the employer with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and (4) the employer receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services provided in connection with payroll deductions or dues checkoffs.  Id.  Moorman asserts that all elements are satisfied, while Defendants claim that the third element has not been established.[17]  Because the analysis of whether Southeastern Steam established or maintained the Plan is not completely distinct from the safe harbor evaluation, much of the same evidence previously discussed will be relevant here as well. Consequently, the court will rely on its discussion above rather than restating that discussion here.

---

[17]Defendants had disputed whether Southeastern Steam contributed to the Plan by facilitating the pre-tax payment of premiums by employees but have now withdrawn this argument.

For an employer to satisfy the endorsement element and fall under the safe harbor exception, it must "refrain from *any* functions other than permitting the insurer to publicize the program and collecting premiums." Butero, 174 F.3d at 1213. Additionally, the Department of Labor has described when an employer will be seen as having endorsed a particular plan:

> An employee organization will be considered to have endorsed a group or group-type insurance program *if the employee organization expresses to its members any positive, normative judgment regarding the program*. An employer or employee organization may, in the course of permitting an insurer, insurance agent, or insurance broker to market a group or group-type insurance program to its employees or members, facilitate the publicizing and marketing of the program, but only to an extent short of endorsing the program. An endorsement within the meaning of § 2510.3-1(j)(3) occurs if the employee organization urges or encourages member participation in the program *or engages in activities that would lead a member reasonably to conclude that the program is part of a benefit arrangement established or maintained by the employee organization.*

Dept. of Labor Op. No. 94-23A at 7-8 (July 1, 1994) (emphasis added).

Because there are only guiding principles and no clear definition of what actions constitute endorsement, the court must consider the facts of the case to determine whether Southeastern Steam endorsed the Plan. Other courts have found certain facts determinative of whether an employer endorsed a particular plan. In Anderson, the Eleventh Circuit Court of Appeals left undisturbed the district court's decision that the defendant had endorsed the plan because the defendant singled the

plan out as the sole plan available to hourly employees, played a role in selecting the premium rates, restricted employee eligibility, displayed its corporate logo on the policy documents provided to employees, was named in the policy documents as the plan administrator, and provided a summary plan description to employees that specifically referred to ERISA.   369 F.3d at 1262.   In Butero, the court determined that the employer had endorsed the plan because it had chosen the insurer, decided on key terms, deemed certain employees ineligible for participation, incorporated policy terms into the summary plan description for its cafeteria plan; and retained the ability to alter compensation reduction for tax purposes.   174 F.3d at 1213-14.

Defendants assert that Southeastern Steam endorsed the Plan because (1) Southeastern Steam chose the insurer; (2) Southeastern Steam defined which employees would be eligible to participate; and (3) a participant could obtain claim forms from Southeastern Steam.   Moorman responds that "Southeastern Steam in fact *did not* choose the insurer, *did not* define which employees would be eligible to participate, and *did not* assist employees in filing claims for benefits."[18]

─────────────────

[18]Additionally, Moorman points to Carter's Affidavit, in which she broadly states, "It was never the understanding of any employee of Southeastern Steam that the Plan was offered, administered or in any way controlled by Southeastern Steam, or that Southeastern Steam sponsored or endorsed the Plan."   Nevertheless, the court cannot simply accept Carter's attestation of the understanding of the employees.   In her deposition, Carter was asked, "[Y]ou don't have any actual knowledge as to the understanding of any particular employee of the company as to whether the plan was or

<u>Choosing the Insurer</u>

As noted, Defendants contend that Southeastern Steam chose Unum Life as the insurer.  Both Glenn and Carter state that they had no prior contact with each other before Glenn sent his initial letter dated October 19, 1996, in which he requested to discuss with Southeastern Steam's individual employees their interest in disability insurance.  Glenn and Carter also state that on April 24, 1997, Glenn met with employees to discuss the Plan, but that there were no Southeastern Steam representatives present.  It is clear to the court that the record shows Glenn approached Southeastern Steam, and that Southeastern Steam did not seek him out or actively choose Unum Life as its insurer.

<u>Employee Eligibility</u>

Defendants also assert that Southeastern Steam determined eligibility.  As noted above, it is undisputed that Southeastern Steam decided on at least one of the eligibility terms under the Plan, the waiting period.

<u>Maintaining and Submitting Claim Forms</u>

As further evidence of endorsement, Defendants point to Southeastern Steam's administrative duty of filing a portion of the claim form.  As discussed above, it is

---

was not endorsed or sponsored by Southeastern Steam?"  She responded, "Well, no, not really, you'd have to ask them."

undisputed that Southeastern Steam maintained a limited supply of claim forms and that Carter completed and submitted claim forms to Unum Life on behalf of employees.

In sum, the court finds it is undisputed that Southeastern Steam did not choose Unum Life as the insurer.  However, it is also undisputed that Southeastern Steam determined at least one term of eligibility and that Southeastern Steam maintained claim forms, which it completed and submitted on behalf of employees.  These facts, combined with the facts discussed previously, which were relevant to the court's finding that Southeastern Steam established an employee welfare benefit plan, show that Southeastern Steam did more than collect premiums and permit the insurer to publicize.  Thus the court finds that Southeastern Steam endorsed the Plan, taking it out of the safe harbor exception.  The court further holds that because Southeastern Steam established an employee welfare benefit plan and the Plan does not fall under the safe harbor exception, the Plan is governed by ERISA.  Defendants' motion for summary judgment as to the issue of ERISA governance is therefore GRANTED.

## V.   **Defendants' Motions to Dismiss**

Having granted Defendants' converted motion for summary judgment, the court must now evaluate Defendants' motions to dismiss Moorman's claims, which are:  Count One:  Breach of Express Contract; Count Two:  Breach of Implied Contract;

Count Three:  Breach of the Covenant of Good Faith and Fair Dealing; Count Four: Tortious Interference with Contract; Count Five:  Fraud; Count Six: Conspiracy; Count Seven:  Promissory Estoppel; Count Eight:  RICO; Count Nine: Georgia RICO; Count Ten:  Bad Faith Refusal to Pay Insurance Claim; Count Eleven: Intentional Infliction of Emotional Distress; Count Twelve:  Wrongful Denial of Benefits Pursuant to ERISA; Count Thirteen:  Breach of Fiduciary Duty Pursuant to ERISA; Count Fourteen:  Failure to Provide Documents Pursuant to ERISA; and Count Fifteen: Failure to Provide Documents Pursuant to Georgia Insurance Law.

Defendants moved for dismissal for the following reasons:  (1) Moorman's state law claims are preempted by ERISA because the Plan is governed by ERISA, and they fail to state a claim, and (2) Moorman's federal RICO claim is inconsistent with the exclusive remedial scheme of ERISA and fails to state a claim.   Alternatively, Defendants request that if any claims survive dismissal, Moorman should be required to provide a more definite statement.

A.    ERISA Preemption of State Law Claims

Defendants assert that Moorman's state law claims are preempted because the Plan is governed by ERISA.  ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a).  "[O]nce rights and responsibilities under ERISA are invoked,

overlapping state law claims are necessarily preempted since they may conflict with ERISA's elaborate system of employee protections." Anderson, 369 F.3d at 1268.

"ERISA leaves relatively little ambit for state regulation of employee benefits plans.  Only statutes or common-law doctrines aimed directly at regulating insurance and the handful of plan types exempted by Labor Department regulation are permitted by ERISA's broad preemption provisions." Henry H. Perritt, Jr. Employee Benefits Claims Law and Practice § 5.28 (1990).  A state law relates to an ERISA plan "if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97 (1983).  "To determine whether there is a forbidden connection, the Court looks both to ERISA's objectives as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the state law's effect on ERISA plans." Egelhoff v. Egelhoff, 532 U.S. 141, 141 (2001).  ERISA preempts both state common law and statutory claims that relate to an ERISA plan. Anschultz v. Conn. Gen. Life Ins. Co., 850 F.2d 1467, 1469 (11th Cir. 1988).

A state law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." Shaw, 463 U.S. at 97.  "[A] party's state law claim 'relates to' an ERISA benefit plan for purposes of ERISA preemption whenever the alleged conduct is intertwined with the refusal to pay benefits." Garren v. John Hancock Mut. Life Ins. Co., 114 F.3d 186, 187 (11th Cir. 1997); see also Variety

<u>Children's Hosp. v. Century Med. Health Plan, Inc.</u>, 57 F.3d 1040, 1042 (11th Cir. 1995).  Because ERISA preemption reaches broadly, the court will not need to devote much discussion to its dismissal of many of the state law claims.

        1.        Tort Claims, Contract Claims, and Bad Faith Claim

Moorman's tort claims, contract claims, and bad faith claim arise out of the alleged wrongful denial of disability benefits to Moorman under the Plan.  Because they are state claims intertwined with the refusal to pay benefits, they are preempted by ERISA.   <u>See</u> <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 47 (1987); <u>Gilbert v. Alta Health & Life Ins. Co.</u>, 276 F.3d 1292, 1299 (11th Cir. 2001).

        2.        Georgia RICO

Moorman's Georgia RICO claim brought pursuant to O.C.G.A. § 16-14-1 <u>et seq.</u> arises from Defendants' alleged "bad faith claims handling scheme."  The court finds that the claim is intertwined with Defendants' refusal to pay benefits and is therefore preempted.

        3.        Fraud

Moorman asserts that his claim for fraud is not preempted by ERISA.  He relies on <u>Morstein v. National Insurance Services, Inc.</u>, 93 F.3d 715, 722 (11th Cir. 1996), for support, which he interprets to have held that "where a party to an insurance contract claims that he or she was induced to *enter into* the agreement through fraud

and misrepresentation, such claims are not preempted by ERISA."  In <u>Morstein</u>, the

court determined that plaintiff's claims for fraudulent inducement against the

insurance agency and agent were not preempted because to preempt such claims

would "immunize agents from personal liability for their solicitation of

potential participants in an ERISA plan prior to its formation."  <u>Id.</u> at 722-23.  Though

the court agrees with Moorman's characterization of the <u>Morstein</u> holding in general,

the facts of <u>Morstein</u> are distinguishable from the facts of the instant case.  The

<u>Morstein</u> court justified its actions because the insurance agency and agent were not

ERISA entities and had no control over the payment of benefits or a determination

of the plaintiff's rights under the plan.  <u>Id.</u> at 722 ("ERISA entities are the employer,

the plan, the plan fiduciaries, and the beneficiaries under the plan.").  In this case, it

is apparent that Moorman considers the Defendants to be fiduciaries because he

brings a claim for breach of fiduciary duty against them.  Moreover, the evidence is

that Defendants control the payment of benefits to Moorman and would thus be

characterized as fiduciaries.  Because Defendants are ERISA entities, the <u>Morstein</u>

holding is inapplicable.  The court finds that Moorman's fraud claim is preempted.

### 4.    Failure to Provide Documents

Moorman also brings a claim for failure to provide documents pursuant to

Georgia law.  O.C.G.A. § 33-39-9 provides that insurance institutions, agents, or

insurance support organizations must provide access to personal information requested by individuals. State laws governing the insurance, banking, and securities businesses are not preempted because the "saving clause" saves them from ERISA's broad preemption clause. <u>See</u> 29 U.S.C. § 1144(b). To determine whether a particular state law regulates the business of insurance, the court must consider the following factors: (1) whether the practice has the effect of transferring or spreading the policy holder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. <u>See</u> <u>Union Labor Life Ins. Co. v. Pireno</u>, 458 U.S. 119, 129 (1982). The court finds that O.C.G.A. § 33-39-9 governs the insurance industry and that it affects the exchange of information between the insurer and the insured. For these reasons, the court finds that Moorman's claim that Defendants violated this Georgia statutory law is not preempted by ERISA.[19]

In sum, Moorman's contract and tort claims, bad faith claim, Georgia RICO, and fraud claim are preempted by ERISA and are therefore DISMISSED. Moorman's

---

[19]Although the court has determined it will not preempt Moorman's claim under O.C.G.A. § 33-39-9, it must still determine whether there are other grounds on which to dismiss the claim. The court will consider whether such grounds exist below.

claim for failure to disclose under O.C.G.A. § 33-39-9 is not preempted.                 B.

Nonpreempted Claims

The court now considers whether Moorman's claims that are not preempted--

failure to provide documents under Georgia law, federal RICO, and the ERISA causes

of actions--should survive Defendants' Motions to Dismiss.

1.        Motion to Dismiss Standard

This court has the power to dismiss a legal action for failure to state a claim,

see Fed. R. Civ. P. 12(b)(6), however, dismissal is not appropriate "unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The court

must accept all factual allegations in the complaint as true and make all reasonable

inferences in favor of the non-moving party. Spanish Broad. Sys., Inc. v. Clear

Channel Communications, Inc., 376 F.3d 1065, 1070 (11th Cir. 2004). The court may

also consider any documents attached as exhibits to, integral to, or relied upon by

plaintiff in filing a complaint. Brooks v. Blue Cross & Blue Shield, Inc., 116 F.3d 1364,

1368-69 (11th Cir. 1997). The "threshold of sufficiency that a complaint must meet

to survive a motion to dismiss for failure to state a claim is exceedingly low." Quality

Foods de Centro Am., S.A. v. Latin Am. Agribus. Dev. Corp., S.A., 711 F.2d 989, 995

(11th Cir. 1983).   "A complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies upon since the court must

determine if the allegations provide for relief on *any* possible theory."   Brooks, 116 F.3d at 1369.  A motion to dismiss is disfavored and rarely granted.  Id.

 2.  Failure to Provide Documents Under Georgia Law

Although the court determined it would be improper to preempt Moorman's claim for failure to provide documents, Defendants also argue that the statute is inapplicable to Moorman because O.C.G.A. § 33-39-9(f) provides:   "The rights granted to all natural persons by this subsection shall not extend to information about them that relates to and is collected in connection with or in reasonable anticipation of a claim . . . ."  O.C.G.A. § 33-39-9(f).  Based on the allegations in the Complaint, any request for documents made by Moorman was in connection with his claim for disability benefits.   Accordingly, the court finds that O.C.G.A. § 33-39-9 is inapplicable, and thus Moorman can have no claim under the statute.  Moorman's claim for failure to provide documents under Georgia law is DISMISSED.[20]

 3.  Federal RICO Claim

---

 [20]Defendants also argue that O.C.G.A. § 33-39-9 creates no express private right of action.  Having reached a decision on other grounds, the court need not consider this argument.

Moorman alleges that Defendants' bad faith claims handling scheme constitutes a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1961 et seq. UnumProvident and Unum argue that (1) Moorman's RICO claim is inconsistent with ERISA's remedial scheme and (2) Moorman has failed to state a claim.

Defendants assert that ERISA's civil enforcement scheme was intended to "be the exclusive vehicle for actions by ERISA-plan participants . . . asserting improper processing of a claim for benefits." Pilot Life, 481 U.S. at 52. Thus, Defendants argue, a RICO action, which allows for treble damages, would frustrate the exclusive remedial scheme Congress devised for ERISA claims. Defendants acknowledge that federal RICO claims are not preempted by ERISA, but contend that, like allowing a bad faith penalty claim that "seeks a remedy for improper processing of claims that goes beyond the remedies and causes of action authorized by ERISA," see Gilbert, 276 F.3d at 1299, allowing recovery under RICO would create the same result. Defendants provide the court with no legal authority that allowing a plaintiff to proceed under RICO would frustrate the exclusive remedial scheme Congress devised for ERISA claims, and the court will not dismiss the claim on grounds for which Defendants have presented no legal authority.

As a second basis for dismissing the claim, Defendants assert that Moorman has failed to state a federal RICO claim. Moorman alleges violations of 18 U.S.C. §§ 1962(c) and (d), which provide:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Id. A special RICO provision, commonly known as civil RICO, permits "[a]ny person injured in his business or property by reason of a violation" of RICO's criminal provisions to recover treble damages and attorney's fees. 18 U.S.C. § 1964(c). Moorman alleges that in implementing and relying upon the bad faith scheme to wrongfully deny the claims of Plaintiff and other policyholders, Defendants committed multiple acts of fraud. Specifically, Moorman avers that Defendants committed "criminal and fraudulent use of interstate United States Mail, wire, telephone, electronic, and other communication networks in violation of 18 U.S.C. §§ 1341 and 1343" and that these acts of fraud are the Defendants' predicate acts. The elements of a civil RICO claim predicated upon mail or wire fraud are:

> (1) that the defendant intentionally participated, (2) in a scheme to defraud, (3) the plaintiff of money or property, (4) by means of material

misrepresentations, (5) using the mails or wires, (6) and that the plaintiff relied on a misrepresentation made in furtherance of the fraudulent scheme, (7) that such misrepresentation would have been relied upon by a reasonable person, (8) that the plaintiff suffered injury as a result of such reliance, and (9) that the plaintiff incurred a specifiable amount of damages.

Sikes v. Teleline, Inc., 281 F.3d 1359, 1360-61 (11th Cir. 2002).

At the motion to dismiss stage, the court must look to whether the Plaintiff has properly stated a claim on which relief can be granted.  The Federal Rules of Civil Procedure generally require only that a complaint set forth a short and plain statement of the plaintiff's claim, Fed. R. Civ. P. 8(a), but they prescribe that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Rule 9(b) was not intended to abrogate the notice pleading requirements of Rule 8, but it has singled out one area, fraud, where the court will require that the circumstances constituting the cause of action be plead with some degree of specificity.  Duracell Inc. v. SW Consultants, Inc., 126 F.R.D. 571, 573 (N.D. Ga. 1989) (Hall, J.).  Rule 9(b) applies to RICO claims in which the predicate acts include allegations of fraud.  Id. at 574.  "Though specific allegations of time and place are not required under the rule, the 'particularity' requirement does compel the plaintiff to inject some measure of precision and substantiation into his or her allegations of mail and wire fraud."  Id.  In the instant case, Defendants assert that

Moorman has not provided the details of any act of mail or wire fraud.   The

Complaint alleges that Defendants' fraud and interstate mail and wire fraud:
(1) were numerous; (2) were of longstanding duration and constituted
a "pattern" of activity; (3) were intentional; (4) could reasonably be
expected to cause, and were committed so as to cause, Plaintiff's injury
as alleged herein; (5) were directed at Plaintiff as an intentional target
of Defendants' fraudulent activities; (6) were relief upon by Plaintiff;
(7) directly caused Plaintiff to enter into and maintain the contractual
relationship at issue in this litigation; (8) with the result that Plaintiff
was directly and causally "injured in his business or property" by said
predicate acts; (9) which injury Plaintiff would not have suffered but for
the fraudulent actions of Defendants; (10) were likewise directed at
numerous other individuals in Plaintiff's situation; all of whom have
suffered injury similar to Plaintiff's; and (11) were actions, and caused
injury, of the type explicitly sought to be targeted by the Legislature in
the statute's enactment.

Moorman points to various portions of the Complaint to support his position that he

has plead the predicate acts of his federal RICO claim with sufficient specificity.   The

court finds that Moorman has met the particularized pleading requirements of Fed.

R. Civ. P. 8 because Moorman has provided details of letters and telephone

conversations in which he alleges Defendants conveyed misrepresentations.

Defendants' motion to dismiss as to Moorman's federal RICO claim is DENIED.

4.     ERISA Claims

a.     Wrongful Denial of Benefits

In the motion to dismiss filed by Defendants UnumProvident (and Unum),

Defendants moved for dismissal of Moorman's claim for wrongful denial of benefits

under ERISA because such claims must be brought against the entity with discretionary authority to pay benefits under an ERISA plan--in this case, based on the allegations in the Complaint, Unum Life. Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 907-09 (11th Cir. 1997). Defendant Unum Life expressly does not seek dismissal of Moorman's claim against Unum Life for wrongful denial of benefits pursuant to ERISA. Thus, the court assumes the claim should remain because the party against whom it would be enforced has not sought its dismissal.

> b.      Breach of Fiduciary Duty

Defendants have moved for dismissal of Moorman's claim for breach of fiduciary duty under ERISA, see 29 U.S.C. § 1132(a)(3), because ERISA affords an adequate remedy under 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has characterized 29 U.S.C. § 1132(a)(3) as a "catchall" provision, which affords relief to plan participants for injuries caused by violations for which 29 U.S.C. § 1132(a) does not elsewhere provide an adequate remedy. Varity Corp. v. Howe, 516 U.S. 489, 512 (1996). The Eleventh Circuit has determined that, after Varity, ERISA plan participants who avail themselves of potential remedies authorized by 29 U.S.C. § 1132(a)(1)(B) cannot additionally pursue equitable relief under 29 U.S.C. § 1132(a)(3). See Ogden v. Blue Bell Creameries U.S.A., Inc., 348 F.3d 1284, 1287 (11th Cir. 2003). Moorman contends, however, that his Complaint states more than a claim

for wrongful denial of benefits because he alleges additional breaches of fiduciary duties.[21]   At this early stage of litigation, the court agrees with Moorman that if it is possible that there are separate allegations giving rise to wrongful denial of benefits and a separate breach of fiduciary duty, then Moorman is not barred from making claims under both 29 U.S.C. §§ 1132(a)(3) and 1132(a)(1)(B).

Defendants have also moved for dismissal of the breach of fiduciary duty claim on the grounds that UnumProvident is not a fiduciary under the Plan.  ERISA defines fiduciary, in pertinent part, as follows:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) . . ., or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21).   First, the court notes that Defendants only assert that UnumProvident is not a fiduciary.  They do not discuss whether Unum Life is a

---

[21]The court's review of the Complaint reveals allegations that largely arise from the alleged wrongful denial of benefits, but Moorman also alleges that Defendants have conducted a scheme of bad faith claims handling, have wrongfully terminated employees, and have fraudulently inserted ERISA language into documents (notwithstanding Moorman's failure to present sufficient evidence of such for the court's consideration as to the converted motion for summary judgment, discussed above).  Because the court must take as true the allegations of the Complaint, and because motions to dismiss are generally disfavored, the court finds that Moorman has alleged that Defendants committed breaches of fiduciary duty in addition to wrongful denial of benefits.

fiduciary under the Plan, and Moorman alleges in the Complaint that Defendants, which would include Unum Life, exercised discretionary authority over the Plan. Therefore, it is possible that at least one of the Defendants acted as a fiduciary of the Plan.[22]   Accordingly, the court finds it improper to dismiss Moorman's claim for breach of fiduciary duty on this basis.

c.      Failure to Provide Documents

Title 29 U.S.C. § 1132(c)(1)(B) authorizes the imposition of a penalty on "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish a participant or beneficiary . . . ."  Under ERISA, an administrator is:

> (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
> (ii) if the administrator is not so designated, the plan sponsor; or
> (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).   The Plan documents name Southeastern Steam as the administrator, and Defendants argue that any action for failure to provide documents would be against Southeastern Steam because "[a] plaintiff may only

---

[22]The court is not holding that it considers only Unum Life as a possible fiduciary. Moorman has made general allegations that both Defendants UnumProvident and Unum Life acted as fiduciaries.  The court is simply deciding whether to dismiss the claim on the simplest basis--Defendants' failure to assert that Unum Life is not a fiduciary.

bring a cause of action for violation of the disclosure requirements against the plan administrator." Hightshue v. AIG Life Ins. Co., 939 F. Supp. 1350, 1360 (S.D. Ind. 1996). Moorman does not dispute that the Plan documents name Southeastern Steam as administrator, but Moorman contends that he has alleged that the designation was fraudulently made and that Unum Life was actually acting as the administrator. The Eleventh Circuit Court of Appeals has determined that "if a company is administering the plan, then it can be held liable for ERISA violations, regardless of the provisions in the plan document." Rosen v. TRW, Inc., 979 F.2d 191, 193-94 & 193 n.1 (11th Cir. 1992) ("If the company is acting as a plan administrator, then it should be held liable for such conduct regardless of a sham designation in the plan document."). Accordingly, the court finds that it is possible Moorman could show that Unum Life acted as a plan administrator, and, consequently, it would be premature to dismiss Moorman's claim for failure to provide documents at this stage of the proceedings. Defendants' Motions to Dismiss as to Moorman's ERISA claims is DENIED.

In sum, the only remaining claims in the case are Moorman's federal RICO claim and his ERISA claims.[23] The other counts have been DISMISSED.

_____

[23]The court finds that Moorman's remaining claims have been pled with sufficient detail. Therefore, the court DENIES Defendants' alternative motions for more definite statements.

**VI.**   **Summary**

For the foregoing reasons, Plaintiff's Motion for Leave to Depose Defendant UnumProvident Corporation and/or Defendant Unum Life Insurance Company of America and for Additional Time to Submit Summary Judgment Materials [Doc. No. 37] is DENIED; Defendants UnumProvident Corporation and Unum Corporation's Motion to Dismiss Plaintiff's Complaint or Alternatively for a More Definite Statement [Doc. No. 3] is GRANTED IN PART and DENIED IN PART; Defendant Unum Life Insurance Company's Motion to Dismiss [Doc. No. 26] is GRANTED IN PART and DENIED IN PART; and Defendants' Converted Motion for Summary Judgment as to ERISA governance is GRANTED.

The parties are assigned to a four month discovery period to expire on June 17, 2005. NO EXTENSIONS OF THIS DISCOVERY PERIOD WILL BE GRANTED.

IT IS SO ORDERED, this 17th day of February, 2005.

s/Beverly B. Martin_____
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE